UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSANNA DATRES,

      Plaintiff,

                                   Case No. 1:23-cv-519

v.

                                   Hon. Hala Y. Jarbou

ARISKNIGHT WINFREE, et al.,

      Defendants.

_____/

**<u>OPINION</u>**

Plaintiff Susanna Datres, an Italian citizen, brings this suit against multiple defendants arising out of an alleged sexual assault of her by Defendant Arisknight Winfree ("A. Winfree"), who she met through an au pair matching service, www.aupair.com.  In her first amended complaint (ECF No. 6), Datres raised several claims, all sounding in tort, and invoked the Court's diversity jurisdiction.  On December 6, 2023, the Court determined it lacked subject matter jurisdiction under 28 U.S.C. § 1332 because foreign citizens lay on both sides of the controversy (ECF No. 80).  The Court directed Datres to file a motion for leave to amend her complaint in order to cure the jurisdictional defect.  Before the Court is that motion (ECF No. 83).  Also before the Court is a still-pending motion to dismiss by Defendants Multikultur E.K. ("MK") and Rafael Bujara, for which this Court previously deferred consideration (ECF No. 54).

Datres's proposed second amended complaint primarily adds several federal questions, thereby attempting to abrogate the jurisdictional defect by invoking § 1331 instead of § 1332.[1]

---

[1] The second amended complaint also drops all claims against Defendants LisAurel Winfree and David Winfree, and names Paul Heiselman as an additional Defendant.

Several Defendants oppose the motion, arguing that the amendment would be futile for failure to state a claim under Federal Rule 12(b)(6).

Additionally, in their still-pending motion to dismiss, MK and Bujara move for dismissal under Rules 12(b)(1) (subject matter jurisdiction), 12(b)(2) (personal jurisdiction), and 12(b)(6) (failure to state a claim).  They also move for dismissal under the doctrine of *forum non conveniens*.

Finally, before the Court are two motions to stay—one submitted by A. Winfree (ECF No. 87) and one submitted by MK and Bujara (ECF No. 97).

## I. FACTS

The following facts are taken from Datres's proposed second amended complaint.  At this stage, these facts are taken as true.

### A. Datres Seeks an Au Pair Position Through aupair.com

In April 2022, Datres became interested in pursuing an au pair position in the United States. (Proposed 2d Am. Compl. ¶ 31, ECF No. 83-1.)  To that end, she created an account on www.aupair.com ("aupair.com" or "the Website"), an online matching platform that connects would-be au pairs with host families.  (*Id.* ¶¶ 7, 32.)

The Website is owned and operated in some combination by Defendant MK, a German company, and by Defendant Agent Au Pair Inc. ("AAP"), a U.S. company.  (*Id.* ¶ 3.)  MK is wholly owned by Defendant Rafael Bujara, a German citizen.  (*Id.* ¶ 22.)

### B. A. Winfree Creates a Host Family Listing on aupair.com

In June 2022, A. Winfree registered on aupair.com, posing as a host family based in East Lansing, Michigan in need of au pair services.  (*Id.* ¶¶ 33, 70.)  He allegedly paid $49.90 per month to access the Website's au pair matching services. (*Id.* ¶ 34.)  Through aupair.com, A. Winfree ultimately matched with several individuals, including a separate, unnamed eighteen-year-old

woman from Kansas who he "lured . . . to his home in East Lansing under the . . . guise of an au pair engagement."  (*Id.* ¶ 38.)

Datres alleges that the owners and operators of aupair.com had no policy in place to "interview host family applicants" like A. Winfree or to "otherwise ensure that host family accounts were actually created by legitimate families looking to host an au pair."  (*Id.* ¶ 36.)  They did, however, initially flag A. Winfree as having "a problematic account with a[] highly suspicious post"  (*Id.* ¶ 253) and issued a warning  (*Id.* ¶ 75).  More specifically, an employee of aupair.com noted:

> [A. Winfree] texted many Au Pairs with the following words: "A perfect aupair for us has no problem following instructions, obeys and respect the head of the family, enjoys being a nurturing influence.  Bonus points if you enjoy cooking or other activities like reading, exploring, being active.  Obedience is very important for us."

(*Id.*)  Despite these apparent concerns, A. Winfree was able to continue to use the service to match with au pairs.

A. Winfree eventually matched with Datres.  He reached out via the Website on September 5, 2022, explaining to Datres "we think you'd be a great fit" and asking her to reach back out on WhatsApp, a separate messaging platform, to discuss further details.  (*Id.* ¶ 39.)  She did so, evidently interested in serving as an au pair for A. Winfree's fictitious family.  In the ensuing discussions, A. Winfree told Datres that his family was looking for an au pair to look after his young niece.  (*Id.* ¶ 41.) He also provided Datres with various instructions on travel arrangements, including a link to register for a visa waiver program and an instruction to tell U.S. immigration authorities that she was travelling for tourism rather than for work.  (*Id.* ¶¶ 42, 48.)

### C. Datres Arrives in Michigan

After first being questioned by immigration authorities in Newark, New Jersey, Datres arrived at Detroit Metropolitan Airport on October 11, 2022.  (*Id.* ¶¶ 49-51.)  At A. Winfree's

instruction, she then took a bus from the airport to East Lansing, Michigan where he picked her up at a bus stop to take her to his home at 343 Highland Avenue.  (*Id.* ¶ 52.)  Although only A. Winfree appears to have resided at 343 Highland Avenue, the property was apparently co-owned by A. Winfree's mother, J. Winfree.  (*Id.*)  Datres describes A. Winfree and J. Winfree as joint owners of the residence.  (*Id.*)

When Datres arrived at A. Winfree's home, she found "that all the windows of the ground floor were covered by newspapers."  (*Id.* ¶ 52.)  And despite being ostensibly hired to babysit A. Winfree's young niece, Datres "noticed that the house lacked toys, clothing, or evidence typical of a toddler living there."  (*Id.* ¶ 53.)  When pressed, A. Winfree responded that "she had to take care of the niece only two weeks per month[,]" and instead asked her to clean his house.  (*Id.*)  She agreed to begin cleaning his house the next day and went to sleep without apparent incident.

### D. A. Winfree Sexually Assaults Datres

On October 13, 2022, Datres began cleaning the house, as A. Winfree requested.  (*Id.* ¶ 55.)  As she cleaned, she noticed that several rooms had video cameras installed, though she did not find a camera in either her bedroom or her bathroom.  (*Id.*)

That evening, A. Winfree asked Datres to take a shower, insisting firmly when she initially declined.  (*Id.* ¶ 56.)  She did so, despite her discomfort.  (*Id.*)  A. Winfree then demanded that Datres go downstairs wearing only her bathrobe, again insisting firmly after her initial refusal.  (*Id.* ¶ 57.)  She did what he asked and entered his bedroom, where he began touching her legs.  (*Id.* ¶ 58.)

Datres immediately rejected A. Winfree's advances.  (*Id.*)  In response, A. Winfree "went behind [Datres] and put his arm around her neck[,]" and handcuffed her arms behind her back.  (*Id.*)  He then put Datres on her belly, touched her genitals, and began taking pictures and videos

4

while asking her to loudly repeat phrases indicating her consent.  He also placed a ball gag in Datres's mouth which apparently caused her to bleed.  (*Id.* ¶¶ 59-61.)

A. Winfree eventually moved Datres to another room where he continued his assault.  This room had a camera.  He kept Datres bound by leaving her in handcuffs, tying her ankles with a towel, and covering her face with a towel.  He penetrated Datres with sex toys and eventually raped her and ejaculated inside her.  Throughout his assault, he continued to demand that she indicate consent and pleasure.  Datres also sustained an injury to her shoulder at some point.  (*Id.* 62-64.)

### E. A. Winfree Releases Datres

Following the assault, A. Winfree left Datres bound and alone for some time.  At around 2:30 a.m. on Friday, October 14, 2022, he removed Datres's restraints, ordered her to get dressed and to pack, and then drove her to a bus stop where he left her.  He also stole Datres's money and removed the SIM card from her cellphone.  (*Id.* 65-67.)

Datres was able to place a call to her boyfriend in Italy on her cellphone via Wi-Fi.  Her family arranged for her to return home to Italy.  She arrived in Milan on October 15, 2022 and went directly to a hospital where she was administered a rape kit.  (*Id.* 67-68.)

### F. Heiselman's Involvement

Datres learned of Defendant Heiselman's involvement from the public court records of a separate criminal case (also before this Court).  In her second amended complaint, she quotes Heiselman's plea agreement in that case:

> [Heiselman] also knew that Arisknight Winfree used the website AuPair.com to pose as a family seeking an au pair, even though Winfree had no need for an au pair.  Rather, Winfree told [Heiselman] that he was going to use the website to entice women and girls to come to Winfree's house and that Winfree then intended to engage in sex acts with those women and girls.  Winfree told [Heiselman] about the fake listing, and he sought [Heiselman]'s input on what language to use in it. [Heiselman] knew Winfree used that fake listing to entice a girl with the initials S.D.[, for Susanna Datres], identified in WDMI Case No. 1:23-CR-15, to come from Italy to Winfree's house to work as an au pair.  Winfree later tied S.D. up and

sexually exploited her.  While S.D. was tied up, Winfree called [Heiselman] and told him as much.  During that conversation, Winfree indicated to [Heiselman] that Winfree intended to kill S.D. and hide her body to avoid prosecution.

(*Id.* ¶ 70.)

## II. JURISDICTIONAL ISSUES

The Court will first resolve the animating issue for Datres's motion to amend the complaint—subject matter jurisdiction.  Because MK and Bujara also raise a personal jurisdiction defense, the Court will address both jurisdictional issues before examining Datres's motion to amend.

### A. Subject Matter Jurisdiction

As an initial matter, the Court is satisfied that it now has subject matter jurisdiction over this case under 28 U.S.C. § 1331.  As discussed below, Datres's proposed second amended complaint contains at least one federal question for which amendment would not be futile, namely several claims arising under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA").  Furthermore, the Court concludes that all other claims brought by Datres are so related to the claims encompassed in the federal question that they form the same case or controversy for Article III purposes. *See* 28 U.S.C. § 1367.

Thus, the Court will exercise its supplemental jurisdiction to consider all claims related to this case.

### B. Personal Jurisdiction

In their still-pending motion to dismiss, Defendants MK and Bujara challenge this Court's exercise of personal jurisdiction over them.

#### 1. Legal Standard

Datres has the burden of establishing the district court's personal jurisdiction.  At this stage, she "need only make a prima facie showing of jurisdiction[,]" which she can meet by "establishing

6

with reasonable particularity sufficient contacts between [MK and Bujara] and the forum state[.]" *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  On this motion, the Court "will not consider facts proffered by the defendant that conflict with those offered by the plaintiff and will construe facts in the light most favorable to the nonmoving party."  *Id.*

### 2. Analysis

When "subject-matter jurisdiction is based on a federal question," as here, "the court's exercise of personal jurisdiction must be both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment."  *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016).  Michigan's long-arm statute allows for both general jurisdiction, Mich. Comp. Laws §§ 600.701, 711, 731, and limited jurisdiction, Mich. Comp. Laws §§ 600.705, 715, 735.  A plaintiff can survive a motion to dismiss under Federal Rule 12(b)(2) if she can establish a prime facie case for at least limited jurisdiction (also known as "specific jurisdiction"); at that point, an analysis of general jurisdiction is unnecessary.  *See Neogen*, 282 F.3d at 889.

Although courts have often collapsed the Michigan long-arm statute analysis with the federal due process analysis, *see e.g., AlixPartners*, 836 F.3d at 549, the Sixth Circuit recently clarified that Michigan law "requires that we conduct two separate inquiries when determining whether a court sitting in Michigan has personal jurisdiction over a defendant."  *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 666 (6th Cir. 2023).  The Court begins with the long-arm statute.

### (a) Michigan's Long-Arm Statute

Datres easily meets the text of the limited jurisdiction portion of the long-arm statute. Section 600.705(1) provides for jurisdiction if an individual defendant engages in "[t]he transaction of any business within the state."  A similar provision exists for corporations, § 600.715(1), and unincorporated associations, § 600.735(1).  This provision is satisfied "by the

slightest act of business in Michigan." *AlixPartners*, 836 F.3d at 549.  Datres alleges that A. Winfree, a Michigan resident, purchased a matching service subscription from aupair.com, owned and operated by MK and Bujara (as well as AAP).  She also alleges that employees of the Website directly interacted with A. Winfree when they issued a warning about the wording of his host family profile.  Selling a subscription service to a Michigan resident and then interacting with him within the confines of that service is at least "the slightest act of business" in the state.

Section 600.705(2) and its equivalents also provide a potential basis for personal jurisdiction here.  This section focuses on the relationship to the forum state created by "[t]he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort[.]"  § 600.705(2).  This section "encompasses a defendant's 'acts outside the state which have consequences inside the state.'"  *Sullivan*, 79 F.4th at 668 (quoting *Dornbos v. Kroger Co.*, 157 N.W.2d 498, 500 (Mich. Ct. App. 1968)).  So long as either the tortious conduct or the injury occurs in Michigan, § 600.705(2) is satisfied.  *Id.* (citing *Green v. Wilson*, 565 N.W.2d 813, 817 (Mich. 1997)).  Here, Datres alleges that all of her injuries occurred in Michigan and stemmed from both her and A. Winfree's relationship with the owners and operators of aupair.com.  That is sufficient at least to meet the broad text of Michigan's long-arm statute.  Indeed "Michigan courts have interpreted [§ 600.705] liberally to permit a wide-ranging exercise of personal jurisdiction." *Id.* at 670 (internal quotation marks omitted).

### (b) Federal Due Process

The question thus turns on federal constitutional due process considerations.  Due process requires a defendant to have "certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (cleaned up, citing *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).  Courts employ a three-part test:

8

> First, the defendant must *purposefully avail* himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.* 503 F.3d 544, 549 (6th Cir. 2007)).

*Purposeful Availment.* Under the Due Process Clause, MK and Bujara "must have taken some act by which [they] purposefully availed [themselves] of the privilege of conducting activities within [Michigan]. The contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Id.* at 671 (cleaned up, internal quotation marks omitted). Further, "[t]he operation of an Internet website can constitute . . . purposeful availment . . . 'if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" *Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002) (quoting *Neogen*, 282 F.3d at 890).

Again, Datres alleges that a Michigan resident purchased, to the tune of around $50 per month, a matching service subscription from aupair.com, which is owned and operated by MK and Bujara. And although these Defendants argue that their operation of the Website was merely "passive," Datres's allegations suggest otherwise. For example, she details an instance where employees of aupair.com issued a "warning" to A. Winfree for a suspicious host profile and/or suspicious messages sent to multiple au pair profiles. (Proposed 2d Am. Compl. ¶ 253.) At least as far as website interactivity is concerned, when taking Datres's allegations as true, the Court finds that these Defendants' operation of aupair.com is on the higher interactivity side of the "sliding scale" used by courts in examining purposeful availment in the internet context. *See Neogen*, 282 F.3d at 890 (citing *Zippo Mfg. Co. v. Zipp Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

Furthermore, the nature of the services offered here belies the notion that any connection with Michigan was strictly random.  According to Datres, these Defendants are "engaged in the business of selling the matching service of au pair[s] (pairing U.S. families with young foreign workers)[.]"  (Proposed 2d Am. Compl. ¶ 277.)  The service only has value, then, if there are families in the United States willing to match with foreign au pairs.  In other words, aupair.com benefited from having an ostensible family willing to host a foreign au pair in the state of Michigan.  And given that they monitored A. Winfree's account enough to know when he was wording his profile and messages suspiciously, they certainly knew that A. Winfree was a Michigan resident seeking to host au pairs in his home state.  This is sufficient for the purposeful availment portion of Datres's prime facie case for personal jurisdiction.

*Relatedness.*  The Due Process Clause next requires "an affiliation between the forum and the underlying controversy."  *Sullivan*, 79 F.4th at 671-72 (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2016)).  This requires nothing more than that "defendant's contacts be related to the operative facts of the controversy" and is a "lenient standard" requiring only that a suit "arise out of or relate to the defendant's contacts with the forum."  *Id.* at 672 (internal quotation marks omitted).  Further, the Supreme Court has rejected a causation-only approach—specific jurisdiction "does not require proof that the plaintiff's claim came about because of the defendant's in-state conduct."  *Id.* (internal quotation marks omitted).

Datres and A. Winfree met on aupair.com.  Datres asserts, among other things, that MK and Bujara were at least negligent in allowing A. Winfree to have a profile on the Website and to contact her.  In other words, were it not for aupair.com, A. Winfree would not have had the tools to meet Datres and entice her to Michigan where he could then carry out his plan to sexually assault her.  While this may be too attenuated to say that MK and Bujara's contacts with a Michigan

resident "caused" Datres's injuries, causation is not a requirement. The relationship between these Defendants' contacts with Michigan—selling the au pair matching service to A. Winfree—and Datres's injuries is at least related enough to satisfy the "lenient standard" of the due process inquiry. Datres's injuries "arise out of or relate" to MK and Bujara's connection with Michigan.

*Reasonableness.* Finally, the Due Process Clause requires that exercising personal jurisdiction would be reasonable and "comport with traditional notions of fair play and substantial justice." *Id.* at 674 (internal quotation marks omitted). When a court finds that the first two factors—purposeful availment and relatedness—are present, "an inference arises that this third factor is also present." *Id.* (internal quotation marks omitted). A court should consider several factors, including the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies. *Id.*

Here, with the first two factors established, exercising personal jurisdiction over MK and Bujara is presumptively reasonable. Undoubtedly, haling these German defendants into court in Michigan is a substantial burden on them. But these defendants willingly shouldered the possibility of that burden when they chose to transact with A. Winfree, a Michigan resident, and interact with him during their business relationship.

Datres's interest in obtaining relief is plain and her choice of forum is obvious—her injuries occurred in Michigan, principally at the hands of a Michigan resident. And the State of Michigan has an interest in providing a forum for that relief.

Finally, when compared to other states, Michigan is the clear choice of forum. MK and Bujara's arguments that they operate a "passive" website and are essentially agnostic as to both host family location and whether a host family actually matches with an au pair seems to imply

11

that there is *nowhere* in the United States in which they could be sued.  But that is belied by both the facts alleged and logic.  Datres alleges injuries in the United States stemming from these Defendants' negligent provision of services to a United States citizen.  She alleges that they target the United States generally by offering to would-be au pairs the promise of U.S.-based host families.  When things go awry and injuries result in the U.S., these Defendants should be amenable to suit *somewhere* in this country; here, that somewhere is the State of Michigan.

None of the arguments raised by MK and Bujara overcome the presumption of reasonableness that arises from their purposeful availment of the forum state and Datres's related injury.  In conclusion, Datres has alleged sufficient facts to make a prima facie case for the exercise of personal jurisdiction.  Many of the arguments MK and Bujara raise in opposition are based on questions of fact.  At this stage, it is inappropriate for the Court to consider anything beyond the pleadings.  The Court is satisfied that it may exercise personal jurisdiction over all named Defendants.

### C. *Forum Non Conveniens*

MK and Bujara also argue that *forum non conveniens* requires dismissal here because a binding, enforceable forum selection-clause governs this controversy.  While it is true that courts must generally honor a mandatory, valid, and enforceable forum-selection clause that is relevant to the controversy, *see Atlantic Marine Construction Company v. United States District Court for the Western District of Texas*, 571 U.S. 49, that analysis involves significant factual determinations that have no place at this stage.  Critically, that analysis at least involves an examination of the agreed-upon terms of service, which Datres has neither attached to her complaint nor referenced.  While the terms of service may be somewhat relevant to the controversy at hand, Datres's complaint certainly does not center them.  This is not a contract dispute.  Without terms of service central to Datres's claims and referred to in her complaint, it would be inappropriate for the Court

to consider MK and Bujara's factual assertions related to the terms of service.  The Court thus concludes that, for now, venue is appropriate in the Western District of Michigan.

### III. MOTION TO AMEND/MOTION TO DISMISS

Defendants J. Winfree, AAP, MK, and Bujara all oppose Datres's motion to amend her complaint, arguing futility.  They argue that Datres has failed to allege sufficient factual allegations to sustain her newly asserted causes of action against them.  J. Winfree also argues that Datres has failed to state any claim against her, including the tort claims initially featured in the first amended complaint.  Defendants A. Winfree and Heiselman did not file responses opposing Datres's motion.

### A. Legal Standards

#### 1. Motion to Amend the Complaint

When a plaintiff requests leave to amend their complaint, the Court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a).  "Denial may be appropriate, however, where there is 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'"  *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Here, Defendants primarily make futility arguments.

An amendment would be futile if it would not survive a Rule 12(b)(6) motion to dismiss. *Write Start Early Christian Ed. Ctr., LLC v. Nat'l Fire & Marine Ins.*, 836 F. App'x 362, 364 (6th Cir. 2020).  When a proposed amended complaint contains allegations similar in thrust to previous iterations for which a motion to dismiss was filed, "there is no reason to exalt form over substance and force Defendant to file a new motion to dismiss."  *Klein by Klein v. Caterpillar Inc.*, 581 F. Supp. 3d 912, 919 (E.D. Mich. 2022).

13

### 2. Motion to Dismiss for Failure to State a Claim

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint for failure to state a claim.  "While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—that the pleader is entitled to relief."  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory."  *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).  The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or "formulaic recitations of the elements of a cause of action," *Twombly*, 550 U.S. at 555.

Courts are generally bound to consider only the complaint when resolving a motion to dismiss unless the Court converts the motion to one for summary judgment.  *Wysocki v. Int'l Bus. Mach. Corp.*, 60 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are

central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### B.   Trafficking Victims Protection Reauthorization Act (TVPRA) Claims

Datres alleges violations of the TVPRA by each defendant, specifically 18 U.S.C. §§ 1589, 1590, 1591, and 1595.

### 1. Elements of a TVPRA Claim

Section 1589 focuses on forced labor.  It punishes "whoever knowingly provides or obtains the labor or services of a person . . ." by specified means.  18 U.S.C. § 1589(a).  Those means include the following: force, physical restraint, or threats of either; serious harm or the threat thereof; and any scheme, plan, or pattern intended to cause the belief that, if the person did not perform labor or services, that person or another would suffer serious harm or physical restraint. *Id.* § 1589(a)(1)-(4).

Section 1590 targets trafficking and punishes "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter[.]"  18 U.S.C. § 1590(a).

Section 1591 provides criminal penalties for "whoever knowingly[,]" in interstate or foreign commerce, "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" when they know or are in reckless disregard of the fact that a victim "will be caused to engage in a commercial sex act" through force, threats of force, fraud, or coercion.  18 U.S.C. § 1591(a).  It similarly criminalizes anyone who knowingly "benefits, financially or by receiving anything of value, from participation in a venture" which has engaged in such conduct.  *Id.* § 1591(a)(2).  "Participation in a venture" is defined as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."  *Id.* § 1591(e)(4).  A

"venture" is "any group of two or more individuals associated in fact, whether or not a legal entity[.]" *Id.* § 1591(e)(6).

Finally, § 1595 establishes a civil remedy for victims of the foregoing criminal acts. A victim may bring a civil action against a perpetrator or against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged" in such acts. *Id.* § 1595(a).

### 2. A. Winfree

Viewed in the light most favorable to her, Datres has presented sufficient facts to plausibly state a claim against A. Winfree under 18 U.S.C. §§ 1589 and 1590. Datres alleges that she cleaned A. Winfree's home "as instructed," after noticing that the house's windows were covered in newspaper and after he allegedly "confiscate[ed] and ke[pt] [her] means of communication[.]" (Proposed 2d Am. Compl. ¶¶ 53, 55, 120.) The Sixth Circuit has concluded that "cleaning the apartment, running errands for [d]efendants" and other "household chores" are tasks that "certainly constitute labor or service under the ordinary meaning of those words." *United States v. Callahan*, 801 F.3d 606, 620 (6th Cir. 2015).

Datres was not paid for this labor. (*Id.* ¶ 120.) She alleges that she only performed this labor through A. Winfree's use of "physical coercion, isolation, and . . . maintenance [of] control over [her] movement, and means of communication." (*Id.* ¶ 118.) The Court finds plausible the allegation that she only performed this labor because of her vulnerable situation. In other words, given that A. Winfree was Datres's sole contact in the United States, it is plausible that his blacked-out windows, his living situation that was markedly different from the family household described in the aupair.com posting, and his eventual confiscation of her cellphone amounted to a pattern intended to cause belief that she would suffer harm or physical restraint if she did not accede to

his demands.  This would meet the elements of § 1589.  Further, because Datres alleges A. Winfree recruited and helped arrange for her travel to the United States after matching with her on aupair.com, the elements of § 1590 would also plausibly be met.

Section 1591 requires a "commercial sex act," defined as "any sex act on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  The Sixth Circuit has made clear that the "the future verb tense of the phrase 'will be caused'—which precedes 'to engage in a commercial sex act'—indicates that a sex act does not have to occur to satisfy the elements [of § 1591]." *United States v. Willoughby,* 742 F.3d 229, 241 (6th Cir. 2014) (cleaned up).  Further, "anything of value" is broad, and courts have interpreted it as encompassing gains such as career advancement.  *See, e.g.*, *United States v. Flanders*, 752 F.3d 1317, 1330 (finding that defendants were liable under § 1591 because they used fraud to recruit and entice the victims to engage in filmed sex acts with defendants); *Doe v. Knight*, 624 F. Supp. 3d 857, 864 (E.D. Mich 2022) (denying a motion to dismiss based on the commercial sex act element because plaintiff alleged "that the 'value' given was career advancement, and thus the [sexual] assault was commercial in nature").

Datres does not allege any facts which would indicate she received anything of value from any person for engaging in a sex act.  Quite to the contrary, Datres alleges that she was sexually assaulted and raped by A. Winfree.  However, Datres does allege that A. Winfree enticed her to come to Michigan for the promise of an au pair job during which his "family" would pay for her living expenses and for which she would get paid.  She alleges that he lured her in anticipation of her agreeing to have sex with him, then sexually assaulted her when she refused.  She also alleges that he took sexually explicit photos of her and filmed his sexual assault of her.

These facts plausibly meet the statutory element of any person receiving anything of value in at least two ways.  First, it is plausible that A. Winfree enticed Datres by offering a fraudulent au pair position which he would later leverage to convince her to have sex with him.  Indeed, Datres alleges that he did make this attempt.  In this formulation, Datres is receiving a type of "career advancement" that other courts have found meet the definition of "anything of value."  *See, e.g., Ardolf v. Weber*, 332 F.R.D. 467, 478-79 (S.D.N.Y. 2019); *Knight*, 624 F. Supp 3d at 864.  It is immaterial that Datres never agreed to have sex with him.

Second, it is plausible that A. Winfree received sexually explicit photos and videos when he filmed his sexual assault of Datres.  Although Datres does not allege what A. Winfree planned to do with these materials, they could nevertheless be considered to have value, e.g., as pornography.  In fact, Datres's inclusion of Heiselman's plea agreement contains a reference to A. Winfree's possession and distribution of child pornography.  Upon receipt of the pornography, Heiselman referred to the minor victim as being "ready for the cams."  (Proposed 2d Am. Compl. ¶ 182.)  This suggests some desire on behalf of A. Winfree and Heiselman to leverage their illicit sexual activities into the production of pornography. Both of these scenarios can sufficiently establish the "anything of value" element of § 1595 for purposes of Datres's motion to amend her complaint.

The Court concludes that Datres has at least asserted sufficient facts in her proposed amended complaint to be allowed to add these TVPRA claims against A. Winfree.

### 3. Heiselman

Datres alleges that Heiselman collaborated with A. Winfree on the creation of the fake au pair listing used to lure her to the United States.  This plausibly satisfies the recruiting elements of both § 1590 and § 1591.  Datres also alleges that Heiselman knew of the sexual assault and rape, satisfying the knowledge requirements of the statute.  A violation of § 1589 is perhaps more

18

attenuated but without argument to the contrary, this is sufficient at this stage to survive a futility analysis of Datres's motion to amend.  Datres will be allowed to amend her complaint to add these TVPRA claims against Heiselman.

### 4. J. Winfree

Datres's theory of how TVPRA liability attaches to J. Winfree is as follows:

> In purchasing the premises at 343 Highland Avenue, East Lansing, Michigan on July 26, 2022, at a time in which defendant [A. Winfree] had already conceived and was executing the plan to lure [Datres] in the U.S., defendant [J. Winfree] knowingly facilitated, permitted, and/or provided her son, defendant [A. Winfree], the means and/or the opportunity to exploit [Datres's] labor and services . . .

(Proposed 2d Am. Compl. ¶ 173; *see also id.* ¶¶ 174-76.)  Datres asserts that this is sufficient to consider J. Winfree not only a beneficiary under § 1595, but a principal perpetrator under §§ 1589, 1590, and 1591.  The Court disagrees.

Datres runs into significant *mens rea* issues for principal perpetrator liability under the TVPRA.  Both § 1589 and § 1590 require actual knowledge of forced labor and trafficking.  But J. Winfree's purchase of 343 Highland Avenue "at a time in which defendant [A. Winfree] had already conceived and was executing the plan" does not plausibly establish knowledge on the part of J. Winfree.  Datres does not, for example, allege that J. Winfree was aware of A. Winfree's scheme when she purchased the house.  In fact, Datres does not allege that J. Winfree even knew that Datres ever visited or stayed at 343 Highland Avenue.  Without alleged facts establishing knowledge, Datres cannot establish perpetrator liability against J. Winfree under either § 1589 or § 1590.

Section 1591 has a somewhat lower *mens rea* requirement, at least as it relates to a defendant's knowledge of the sexual component of any trafficking.  In short, J. Winfree can be liable if she knowingly trafficked Datres or knowingly benefitted from the trafficking of Datres *in reckless disregard* of the fact that Datres would be forced to engage in a commercial sex act.  *See*

18 U.S.C. § 1591(a); *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016).  The Sixth Circuit has interpreted § 1591 to require knowing participation in a sex trafficking venture, not merely a venture in which one participant was otherwise engaged in sex trafficking.  *Afyare*, 632 Fed. App'x at 283-86.  Further, "[t]wo or more people who engage in sex trafficking together are a sex-trafficking venture."  *Id.* at 286.

Similarly, § 1595 expands TVPRA liability from direct perpetrators to anyone who "knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."  18 U.S.C. § 1595(a).  Sections 1591 and 1595 differ from one another in two key aspects—first, § 1591 is relegated to sex trafficking ventures while § 1595 refers to any kind of venture.  Second, § 1591 requires at least "reckless disregard" of illicit activity while § 1595 requires only that a defendant "should have known" about illicit activity.  Some courts have interpreted "should have known" in § 1595 as reflecting a negligence standard, lower than the "reckless disregard" standard of § 1591.  *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 966 (S.D. Ohio 2019).

Here, for either § 1591 or § 1595, it is plausible that a venture existed at least between A. Winfree and Heiselman—it is also plausible that the venture was a sex trafficking venture.  However, Datres has failed to allege facts sufficient to establish J. Winfree's participation in that venture.  She has not alleged that J. Winfree received any benefit, financial or otherwise, from A. Winfree and Heiselman's trafficking—sexual or otherwise.  Nor has she alleged that any such benefit was received "knowingly" by J. Winfree.

But even if Datres had alleged some form of benefit flowing knowingly to J. Winfree, she has not alleged facts sufficient to establish that J. Winfree knew or recklessly disregarded the fact that such a venture was engaged in sex trafficking.  Section 1591

> requires the defendant's personal knowledge (or reckless disregard) that this
> venture (or someone within the venture) . . . used force, fraud, or coercion to cause
> an adult to engage in a commercial sex act.  The defendant's mere membership in
> the venture is insufficient if he is ignorant of the venture's sex trafficking
> activites[.]

*Id.* at 285.  In other words, Datres must allege more than mere guilt by association.  *See id.*  But

she does not do so.

Nor has Datres alleged that J. Winfree knew or should have known that such a venture was

engaged in some other TVPRA violation.  Again, all Datres alleges with respect to J. Winfree is

that she owned the home in which A. Winfree carried out sex trafficking and other TVPRA

violations.  But mere allegations of ownership do not suffice—a plaintiff must allege some facts

that tend to show a defendant was at least on notice of sex trafficking or other illicit activities

occurring on their premises.  *Cf. M.A.*, 425 F. Supp. 3d at 968 (concluding that because plaintiff

had alleged that defendant hotel owners were on notice about sex trafficking *generally* at their

hotels, plaintiff had sufficiently alleged the "should have known" element of § 1595 to survive a

motion to dismiss.); *H.G. v. Inter-Continental Hotels Corp.*, 489 F. Supp. 3d 697, 707 (E.D. Mich.

2020) (disagreeing with the court in *M.A.* and requiring allegations of a defendant's knowledge or

reckless disregard of *particular* sex trafficking ventures taking place on hotel premises to meet the

*mens rea* requirements of § 1595).  Here, Datres alleges no facts from which to infer that J. Winfree

was on notice of any illicit trafficking generally occurring at 343 Highland Avenue, or of A.

Winfree's particular trafficking of Datres.

Here, even when taking as true the factual allegations in the proposed amended complaint,

Datres has failed to establish that J. Winfree would meet any *mens rea* requirement under the

TVPRA.  Her addition of TVPRA claims against J. Winfree would not survive a motion to dismiss,

and thus amendment as to these claims would be futile.

### 5. AAP, MK, and Bujara

Datres alleges that AAP, MK, and Bujara "knowingly facilitated and/or provided [A. Winfree] the opportunity" to commit the TVPRA violations "[t]hrough the posting, promotion, marking, recruiting/registering, and matching service activity conducted via the website www.aupair.com[.]" (Proposed 2d Am. Compl. ¶¶ 195-98.)  In other words, she alleges that these Defendants' operation of aupair.com, which A. Winfree used to make initial contact with Datres, is sufficient for perpetrator liability to attach under the TVPRA.

Datres again runs into a clear *mens rea* problem with her §§ 1589 and 1590 claims against AAP, MK, and Bujara.  Without alleged facts establishing these Defendants' actual knowledge of A. Winfree's scheme, these TVPRA claims would fail a Rule 12(b)(6) motion.

Again, Section 1591 has a lower *mens rea* requirement.  Datres needs to allege facts that establish that, at a minimum, these Defendants knowingly recruited, enticed, or advertised her *in reckless disregard* of the fact that she would be forced to engage in a commercial sex act.  18 U.S.C. § 1591(a)(1).  Or she needs to allege facts that establish that these Defendants participated in a sex trafficking venture with A. Winfree.  *See id.* § 1591(a)(2); *Afyare*, 632 F. App'x at 286. Datres has done neither.

To reiterate, the Website is a matching platform that allows au pairs and host families to find one another.  It cannot be fairly said that AAP, MK, and Bujara recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited Datres merely by allowing her to have a profile on aupair.com.  Nor can it be fairly said that these Defendants were on notice that Datres would have been forced to engage in a commercial sex act merely because they identified one suspicious post by A. Winfree stressing "obedience" as a positive trait for an au pair.  Finally, Datres fails to allege that these Defendants "actually participated in a sex-trafficking venture." *Id.*  There is no indication in the proposed second amended complaint that

these Defendants "engaged in some aspect of the sex trafficking" or "associated for the purpose of furthering the sex trafficking." *Id.* Amending the complaint to add § 1591 claims against AAP, MK, and Bujara would be futile.

That leaves beneficiary liability under § 1595. Again, the key question here is whether AAP, MK, and Bujara "should have known" that they were benefitting from participation in a venture that was engaged in violations of the TVPRA. This question turns on whether these Defendants were on any sort of notice of the illicit activity undertaken by A. Winfree. *See, e.g.*, *M.A.*, 425 F. Supp. 3d at 968. The only indication of such notice is the fact that aupair.com initially flagged A. Winfree's post discussing "obedience." While the post that Datres described in her complaint is perhaps suspicious, particularly when viewed in hindsight, the Court cannot conclude that it was so suspicious as to put the operators of aupair.com on notice of impending sex or labor trafficking.

As with J. Winfree, Datres has failed to allege facts sufficient to meet any *mens rea* requirement under the TVPRA as it relates to AAP, MK, and Bujara. Amending the complaint to add TVPRA claims against these Defendants would be futile.

### C. Transportation, Promotion, or Facilitation of Prostitution and Sex Trafficking Claims

Datres alleges violations of 18 U.S.C. §§ 2421, 2421A, 2422, and 2424 by A. Winfree, Heiselman, and J. Winfree. She notes in her proposed complaint, "As set forth in 18 U.S.C. § 2421A(c), [Datres] may bring a civil action against the perpetrator who violated §§ 2421, 2421A(b), 2422, and 2424." Datres is mistaken.

Section 2421A(c) does indeed allow civil recovery for "[a]ny person injured by reason of a violation of section 2421A(b)." 18 U.S.C. § 2421A(c). But that is the extent of the civil recovery allowed—only for violations of § 2421A(b). Section 2421A makes no cross reference to §§ 2421,

2422, or 2424.  Nor do any of those sections themselves create a civil cause of action.  Datres points to no other statute that would authorize a civil cause of action for these claims—thus, only § 2421A will be analyzed for purposes of her motion to amend.

Section 2421A(b) provides enhanced criminal penalties for "whoever . . . owns, manages, or operates an interactive computer service . . . with the intent to promote or facilitate the prostitution of another person" if that perpetrator either "(1) promotes or facilitates the prostitution of 5 or more persons; or (2) acts in reckless disregard of the fact that such conduct contributed to sex trafficking, in violation of [18 U.S.C.] § 1591(a)[.]"  18 U.S.C. § 2421A(b).  Datres's allegations do not fit the statutory text of § 2421A(b).

The statute refers to an owner, manager, or operator of an interactive website.  Because A. Winfree was merely a user of aupair.com, and not an operator, only AAP, MK, and Bujara could plausibly fit this statutory text.  However, § 2421A liability requires that a defendant aid and abet prostitution—that is, it "proscribes owning, managing, or operating an online platform with the intent to recruit, solicit, or find a place of business for a sex worker[.]"  *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1300 (D.C. Cir. 2023).  As discussed above, Datres has not alleged sufficient facts from which to infer criminal intent on behalf of AAP, MK, or Bujara.

 Also fatal to Datres's claim is that she nowhere alleges an intent by *any* defendant to facilitate her *prostitution*.  There is no doubt that Datres alleges rape and sexual assault by A. Winfree.  Her allegations also create a plausible inference that A. Winfree planned to leverage the offer of an au pair position to entice Datres to have sex with him and that he produced images and videos of the sexual assault.  These could be said to have some financial value or other benefit and thus *may* meet the intentionally broad definition of a "commercial sex act" under 18 U.S.C. § 1591.  But neither sexual assault, nor an attempt to entice someone with a career opportunity, nor the

24

production of sexually explicit images and videos constitutes "prostitution" as that term is generally understood. Datres's allegations simply do not state a viable 18 U.S.C. § 2421A(b) claim.

Without a civil cause of action for §§ 2421, 2422, or 2424, and without allegations that meet the elements of § 2421A(b), none of these claims would survive a 12(b)(6) motion. Thus, amendment would be futile. Datres will not be granted leave to include these claims in her amended complaint.

### D. RICO Claims

Datres alleges RICO violations by Defendants AAP, MK, and Bujara. Section 1964 of the RICO statute provides a civil remedy for "any person injured in his business or property by reason of a violation of section 1962[.]" 18 U.S.C. § 1964(c). A RICO violation under § 1964(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). The fourth element refers to predicate acts enumerated in § 1961(1), of which sex and labor trafficking is included. Furthermore, a pattern of racketeering activity "requires, at minimum, two acts of racketeering activity within ten years of each other." *Id.* (citing 18 U.S.C. § 1961(5)). Two acts may not be sufficient; "in order to show a 'pattern' of racketeering activity, a plaintiff must show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Heinrich*, 668 F.3d at 409 (quoting *H.J. Inc v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)).

Datres fails to adequately plead facts establishing a plausible RICO violation by AAP, MK, or Bujara. Her proposed complaint largely recites the various RICO sections that she asserts apply, but she makes no attempt to connect the facts alleged to the statutory elements. Certainly, she alleges that AAP, MK and Bujara were all involved in an enterprise with one another, but she does

25

not allege facts indicating that that enterprise was conducted through a pattern of racketeering activity.

At least two predicate racketeering acts are required; she alleges none, at least as it relates to these Defendants.  As the Court has already discussed, Datres has not plausibly alleged violations of the TVPRA by AAP, MK, or Bujara.  But even if she had plausibly alleged a violation of the TVPRA with respect to her, she has failed to allege a single other instance of racketeering activity and thus has failed to establish the requisite pattern.  Without a minimum of two predicate racketeering acts, Datres's RICO claims fall well short of the pleading standards.  Adding these claims would be futile.

### E. Alien Tort Statute Claim

Datres seeks to add an Alien Tort Statute ("ATS") claim against all Defendants.  The ATS grants a district court "original jurisdiction of any civil actions by an alien for a tort only, committed in violation of the Law of Nations or treaty of the United States." 28 U.S.C. § 1350.  The ATS is a "jurisdictional statute" that "does not create a cause of action" itself.  *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 630 (2021).  In "certain narrow circumstances courts may recognize a common-law cause of action for claims based on the present-day law of nations, in addition to the historical paradigms familiar when § 1350 was enacted."  *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 256 (2018) (internal quotation marks omitted).  But the Supreme Court has been explicit that "ATS claims must be 'subject to vigilant doorkeeping.'"  *Id.* (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004)).  The "historical paradigms" contemplated by ATS encompass "three specific offenses against the law of nations . . . violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Id.* at 254.

Datres points to sources such as "the Palermo Protocol," the Universal Declaration of Human Rights, the American Convention on Human Rights, and the Declaration of the Elimination

26

of Violence Against Women to fashion a cause of action.  But these sources appear to offer nothing more than familiar definitions of trafficking or, in the case of the "Palermo Protocol," a call to "all nations" to "ensure that its domestic legal system contains measures that offer victims of trafficking in persons the possibility of obtaining compensation."  (Proposed 2d Am. Compl. ¶ 211 (internal quotation marks omitted).)  But Congress *has* offered a way for trafficking victims to obtain compensation—the TVPRA, on which Datres herself relies.  In other words, it is not clear from Datres's motion or proposed amended complaint what cause of action she wishes this Court to recognize that is not already covered by the TVPRA or the other causes of action she already asserts.

Furthermore, Datres's only attempt to connect the factual allegations in the complaint to a cause of action under the ATS is when she asserts that, "Defendants have allegedly violated the Law of Nations and customary international law by requiring and/or causing [Datres] to engage in forced labor, involuntary servitude, peonage, immoral acts, being kidnapped, sexually assaulted and raped, photographed and videoed during the sexual assault."  (*Id.* ¶ 210.)  This largely tracks her TVPRA claims.  For Defendants A. Winfree and Heiselman, that is not necessarily a significant issue.  For J. Winfree, AAP, MK, and Bujara, however, Datres runs into the same issues with the ATS as she does with the TVPRA.  Again, her allegations against J. Winfree are simply that J. Winfree owned the house in which A. Winfree carried out his sexual assault against Datres.  And her allegations against AAP, MK, and Bujara are that they own and operate aupair.com, where A. Winfree first contacted Datres.  These simply are not factual allegations that could plausibly establish that these Defendants "requir[ed] and/or caus[ed]" her "to engage in forced labor" or to be "sexually assaulted and raped[.]"  In short, even if the Court were to recognize a viable cause

of action under the ATS, J. Winfree, AAP, MK, and Bujara would be excluded by Datres's own formulation due to the limited factual allegations against them.

At this stage, the Court will allow Datres to amend her complaint to include the ATS claim against A. Winfree and Heiselman. But amendment to include ATS claims against the remaining Defendants would be futile.

### F. Tort Claims Against A. Winfree

Datres's proposed amended complaint contains numerous tort claims against A. Winfree, including assault and battery, false imprisonment, invasion of privacy, intentional infliction of emotional distress, conversion, and conspiracy to commit unlawful acts. Many if not all of these claims were already included in the first amended complaint. Further, the Court can see no obvious issue that would render futile an amendment to include these claims in the second amended complaint. Thus, Datres will be granted leave to do so subject to the caveat that this does not preclude A. Winfree from filing a separate motion to dismiss.

### G. Tort Claims Against Heiselman

Datres seeks to add tort claims against Heiselman for conspiracy to commit unlawful acts and false imprisonment. Heiselman was not named in the original complaint or the first amended complaint. Similar to A. Winfree, the Court can see no obvious issue that would indicate amendment to add these claims against Heiselman would be futile. Datres will be granted leave to include these claims in her second amended complaint.

### H. Tort Claims Against J. Winfree

Datres seeks to include three tort claims against J. Winfree: negligence, negligent infliction of emotional distress, and conspiracy to commit unlawful acts. J. Winfree opposes all tort claims on the basis of futility and largely adopts the arguments she made in her first motion to dismiss (ECF No. 53).

### 1. Negligence

For J. Winfree, Datres alludes to several species of negligence theories, including general premises liability, innkeeper liability, and negligent parental supervision.  Regardless of the particular theory, "all negligence actions, including those based on premises liability, require a plaintiff to prove four essential elements: duty, breach, causation, and harm." *Kandil-Elsayed v. F & E Oil, Inc.*, 1 N.W.3d 44, 51 (Mich. 2023). Upon review, her complaint suffers from obvious, superficial issues with the duty component of her negligence claim, no matter the particular theory.

As the basis for her negligence claims, Datres alleges that "[J. Winfree] was the co-owner along with defendant [A. Winfree] of the premises at 343 Highland Avenue" and that J. Winfree "owed a duty to [Datres] because of the special relationship with [Datres] as landlord in control of the premises." (Proposed 2d. Am. Compl. ¶¶ 217, 219.)  She alleges that J. Winfree "had a duty to keep [Datres] safe from foreseeable danger" and that "[t]he risk of harm from the criminal activity perpetrated by defendant [A. Winfree] was foreseeable[.]"  (*Id.* ¶ 220.)  More specifically, she asserts J. Winfree owed her the following duties:

> (a) a duty to exercise reasonable care in protecting au pair guests and patrons form the foreseeable risk of sexual assault and imprisonment while being hosted at the premises;

> (b) a duty to exercise reasonable care in protecting au pair guests from the foreseeable risk of sexual assault and imprisonment by defendant [A. Winfree];

> (c) a duty to exercise reasonable care in providing a safe environment during the entire stay of the au pair guest and patron on the premises;

> (d) a duty to exercise reasonable care in ensuring that the premises' host would abide by the laws in Michigan while hosting an au pair; and

> (e) a duty to exercise reasonable care in adequately supervising au pairs selected to enter the premises as a domestic worker.

(*Id.* ¶ 222.)

As an initial matter, in Michigan, "[p]remises liability is conditioned upon the presence of both possession and control over the land . . . [o]wnership alone is not dispositive." *Merrit v. Nickelson*, 287 N.W.2d 178, 180-81 (Mich. 1980). Nowhere in her complaint does Datres allege that J. Winfree was in possession of the land; she only alleges that she co-owned the land with her son.

But even if the Court were to infer J. Winfree's possession of the land from her co-ownership, Michigan law provides "no obligation generally to anticipate and prevent criminal acts against its invitees." *MacDonald v. PKT, Inc.*, 628 N.W.2d 33, 38 (Mich. 2001). Property owners may assume that third parties "will obey the criminal law" and "[t]his assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee." *Id.* at 39.

Indeed, the district court in *Verran v. United States*, 305 F. Supp. 2d 765 (E.D. Mich. Feb. 23, 2004), found that *MacDonald* foreclosed a similar claim. In that case, the plaintiff sued the United States under the Federal Tort Claims Act for her brutal assault and rape by a Marine Corps recruiter. *Verran*, 305 F. Supp. 2d at 766. Among the state law theories advanced was a premises liability claim. The court dismissed that claim, noting that "[m]uch as Plaintiff might wish to characterize [the defendant] as a 'dangerous condition,' he was instead an individual with an alleged propensity to assault women." *Id.* at 774. And "[n]o natter how foreseeable a criminal act might be, Michigan law imposes no duty upon a premises owner to use its knowledge to prevent such an act." *Id.* (citing *MacDonald*, 628 N.W.2d at 39). Datres's claims are remarkably similar to the claims in *Verran*, and the Court rejects her theory of premises liability for the same reasons.

Datres seems to allege that J. Winfree failed to adequately supervise her son when "she blindly permitted defendant [A. Winfree] to create, offer, administer, and take responsibility for

the au pair program and let him search for a young au pair worker[.]"  (Proposed 2d. Am. Compl. ¶¶ 223.)  To the extent she asserts negligent supervision, this claim is a nonstarter.  While Michigan does allow for parents to be held liable for "failing to exercise the control necessary to prevent their children from intentionally harming others if they know or have reason to know for the necessity and opportunity for doing so[,]"  *Zapalski v. Benton*, 444 N.W.2d 171, 173 (Mich. 1989), that does not extend to a parent's adult son.

Datres's complaint contains no allegations that directly connect her to J. Winfree.  She alleges no fact from which to infer that J. Winfree was present at 343 Highland Avenue during the relevant time period, knew of A. Winfree's plan or proclivities, knew of Datres's stay, or even knew of Datres's existence.  She instead asks that this Court to infer a duty merely because J. Winfree co-owned a house with her son and because her son himself formed a relationship with Datres.  But Michigan law forecloses both avenues.  At bottom, J. Winfree had no duty to protect Datres from her adult son's intentional tortious and criminal acts.

### 2. Negligent Infliction of Emotional Distress

Datres's proposed complaint plainly fails to state a claim against J. Winfree for negligent infliction of emotional distress.  This tort focuses on the emotional distress inflicted on a plaintiff who witnesses an injury to his or her immediate family member.  *See Taylor v. Kurapati*, 600 N.W.2d 670, 693 (Mich. Ct. App. 1999) (citing *Wargelin v. Sisters of Mercy Health Corp.*, 385 N.W.2d 75, 81 (Mich. Ct. App. 1986)).  Michigan courts have "refused 'to apply the tort of negligent infliction of emotional distress beyond the situation where a plaintiff witnesses negligent injury to a third person and suffers mental disturbance as a result.'"  *Detroit Water & Sewer Co.*, No. 14-CV-13851, 2015 WL 2084682 (E.D. Mich. May 5, 2015) (quoting *Duran v. The Detroit News*, 504 N.W.2d 715, 720 (Mich. 1993)).  Datres may not bring a negligent infliction of

emotional distress claim when the principal injury is to herself. This claim may not be included in her second amended complaint.

### 3. Conspiracy to Commit Unlawful Acts

Datres also alleges a conspiracy to commit unlawful acts between A. Winfree, J. Winfree, and Heiselman. To that end, she alleges that A. Winfree and Heiselman worked together to create a false family profile on aupair.com to entice Datres to travel to the U.S. where they carried out their plan to sexually assault and falsely imprison her. (Proposed 2d. Am. Compl. ¶ 237.) With respect to J. Winfree, she alleges that "Defendants [A. Winfree] and [J. Winfree] acquired and put at disposal the premises . . . at a time when the plan to sexually assault [Datres] was already conceived, established, and implemented." (*Id.*) Again, Datres's proposed complaint suffers from obvious flaws.

Michigan defines a civil conspiracy as "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003), *aff'd*, 693 N.W.2d 358 (Mich. 2005). "A common design or purpose is the essence of the charge of conspiracy." *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 899 (W.D. Mich. July 1, 2010). To state a viable claim, Datres must allege that each member of the alleged conspiracy shared in the common unlawful purpose.

Here, while Datres pleads a plausible conspiracy claim against A. Winfree and Heiselman, she fails to allege facts that would include J. Winfree in that conspiracy. Once again, Datres alleges no facts that would allow an inference that J. Winfree knew of A. Winfree and Heiselman's scheme, let alone that she shared in that scheme's common purpose. Perhaps this is why Datres refers to "negligent conspiratorial conduct" (Proposed 2d. Am. Compl. ¶ 236), but it is "impossible to conspire to commit negligence[,]" *In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d

287, 327 (S.D. Ohio 2007) (collecting cases); *see also People v. Mass*, 628 N.W.2d 540, 549 (Mich. 2001) (discussing the specific intent requirement of conspiracy).

Without any factual allegation that would allow an inference that J. Winfree knew of and shared in A. Winfree and Heiselman's conspiracy, Datres may not include these claims in her second amended complaint.

### I. Tort Claims Against AAP, MK, and Bujara

Datres includes numerous tort claims against AAP, MK, and Bujara as the joint owners and operators of aupair.com in her proposed second amended complaint. These are largely duplicative of the tort claims included in her first amended complaint.

MK and Bujara's motion to dismiss remains pending. However, that motion does not contain detailed 12(b)(6) arguments related to the tort claims. The only 12(b)(6) argument relates to Bujara, who these Defendants argue should be dismissed for Datres's failure to plead specific actions as to him individually. But Datres's complaint does include allegations about Bujara as a the sole owner and co-operator of aupair.com. She does not allege that MK and AAP are incorporated entities, legally separate from Bujara. And MK and Bujara's motion to dismiss confirms that MK is an entity "akin to that of a domestic sole proprietorship." (MK and Bujara Mot. to Dismiss 16.) Unlike a corporate entity or even a limited liability company, a sole proprietorship is not a distinct legal entity separate from its owner. Thus, the Court is satisfied that claims against MK may also be made against Bujara.

AAP's response to Datres's motion to dismiss largely adopts the arguments made by MK and Bujara. Unlike MK and Bujara, AAP did raise specific 12(b)(6) arguments in response to Datres's first amended complaint. (*See* AAP's Mem. in Supp. of Mot. to Dismiss, ECF No. 30.) Of course, that motion was denied as moot along with most of the other motions to dismiss related to Datres's First Amended Complaint. Regardless, in examining the arguments made in that

motion, the Court concludes that AAP has not shown that Datres should not be granted leave to include the tort claims against AAP in her second amended complaint. In fact, the arguments raised by AAP in that motion to dismiss centered entirely around disputing facts alleged by Datres. For instance, AAP resists the notion that they had any hand in the operation of aupair.com. But Datres's proposed complaint alleges that "AAP is an owner, operator, and/or active participant or constituent of the website www.aupair.com." (Proposed 2d Am. Compl ¶ 19.) Whether or not Datres is correct is a factual dispute that is inappropriate to resolve at the motion to dismiss stage.

Upon review of Datres's tort claims against AAP, MK, and Bujara and without specific 12(b)(6) arguments against adding them, the Court finds no reason to preclude their inclusion in her second amended complaint. These claims may be included.

## IV. MOTIONS TO STAY

A. Winfree moves the Court to dismiss or delay the claims against him until his criminal trial is complete. His criminal trial was assigned to this Court (Case No. 1:23-cr-15). The Court takes judicial notice of the fact that he has now entered a plea of *nolo contendre*, which this Court has accepted. His motion to delay will thus be denied as moot.

In that same motion, A. Winfree also asks that this Court set aside the previous default entered against him (ECF No. 25). He cites difficulties associated with his incarceration and his lack of civil representation. The Court may set aside a default "for good cause[.]" Fed. R. Civ. P. 55(c). Although incarceration and a lack of a civil representation are not reasons to ignore required pleadings, the Court concludes that, given the significant new claims raised by Datres in her proposed second amended complaint, A. Winfree should be given the opportunity to respond in full to the allegations lodged against him. The Court will grant this portion of A. Winfree's motion and will vacate the entry of default.

MK and Bujara also move for a stay while the Court considers the present motion to amend the complaint.  That motion is now moot and will be denied.

## V. CONCLUSION

Datres will be granted leave to amend her complaint in part.  She may include her TVPRA claims against A. Winfree and Heiselman (Counts VI-VIII, X) but not against the remaining Defendants (Counts XII, XIV).  She may not include any of her 18 U.S.C. §§ 2421, 2421A, 2422, or 2424 claims (Counts IX, XI, XIII).  She may not include her RICO claim (Count XV) or her Alien Tort Statute claim (Count XVI), except the portion of the Alien Tort Statute claim related to A. Winfree and Heiselman.  She may not include any tort claim alleged against J. Winfree (Counts XVII-XVIII and portions of Counts XIX-XX), but she may include all remaining tort claims (Counts I-V, XXI-XXV and portions of Counts XIX-XX).  With the inclusion of a proper federal question, the Court is satisfied that it has subject matter jurisdiction over the case.  It is also satisfied that Datres has made a prima facie case for personal jurisdiction which is sufficient for this stage of the matter.  MK and Bujara's pending motion to dismiss will thus be denied without prejudice.

A. Winfree's motion to stay the case pending his criminal trial will be denied as moot.  His embedded motion to vacate the default entered against him will be granted.  MK and Bujara's motion to stay will be denied as moot.

An order will enter consistent with this Opinion.


Dated: April 24, 2024                              /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   CHIEF UNITED STATES DISTRICT JUDGE